**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISON**

| | | |
|---|---|---|
| AMY PIFER, | ) | CASE NO. 1:21-CV-00314-CEH |
| | ) | |
| Plaintiff, | ) | |
| | ) | MAGISTRATE JUDGE |
| v. | ) | CARMEN E. HENDERSON |
| | ) | |
| COMMISSIONER OF SOCIAL SECURITY | ) | |
| ADMINISTRATION, | ) | MEMORANDUM ORDER AND |
| | ) | OPINION |
| Defendant, | ) | |

## I.      Introduction

Plaintiff, Amy Pifer, seeks judicial review of the final decision of the Commissioner of Social Security denying her application for Supplemental Security Income ("SSI"). This matter is before me by consent of the parties under 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73. (ECF No. 18). Because the ALJ followed proper procedures and his findings are supported by substantial evidence, the Court AFFIRMS the Commissioner's final decision denying Pifer SSI.

## II.      Procedural History

On January 19, 2018, Pifer filed an application for SSI, alleging a disability onset date of February 1, 2017. (ECF No. 10, PageID #: 259). The application was denied initially and upon reconsideration, and Pifer requested a hearing before an administrative law judge ("ALJ"). (ECF No. 10, PageID #: 294). On January 3, 2020, an ALJ held a hearing, during which Pifer, represented by counsel, and an impartial vocational expert testified. (ECF No. 10, PageID #: 10, PageID #: 162). On March 6, 2020, the ALJ issued a written decision finding Pifer was not

disabled. (ECF No. 10, Page ID #: 72). The ALJ's decision became final on November 4, 2020,

when the Appeals Council declined further review. (ECF No.  10, PageID #: 60).

On February 8, 2021, Pifer filed her Complaint to challenge the Commissioner's final

decision.[1] (ECF No. 1). The parties have completed briefing in this case. (ECF Nos. 14, 19, 22).

Pifer asserts the following assignments of error:

> (1) Whether the ALJ adequately assessed Plaintiff's seizure
> disorder and mental health impairments.
>
> (2) Whether Plaintiff can perform the suggested jobs provided by
> the vocational expert.

(ECF No. 22 at 3).

## III.    Background

### A.        Relevant Hearing Testimony

The ALJ summarized the relevant testimony from Pifer's hearing:

> With respect to the nature of the claimant's symptoms,
> precipitating and aggravating factors, the medications taken and
> any side-effects, and other measures used to relieve the symptoms,
> the claimant testified that she lived with her mother and her sister.
> She no longer had a driver's license because of seizures. Her
> mother brought her to hearing because she is not allowed to be
> alone. The claimant testified that she could not work because she
> cried all the time and had seizures. She said she had two grand mal
> seizures every other day despite taking four kinds of medication.
> The seizures last 4 to 5 minutes. They started when she was a
> teenager, stopped, and started again when she was 37 years old.
> The claimant said she heard the voice of her deceased son talking
> to her, and saw him all the time. It makes her very emotional. (The
> hearing was recessed briefly to permit the claimant to go outside
> and compose herself). She said she had 5 to 6 similar emotional
> spells a day. She goes to psychotherapy once a week and takes
> medication, but they have not yet found an effective treatment. On
> a typical day, she stays in bed a lot and cries. Her mother gets her

---

[1]  Pifer requested and received an extension of time to commence a civil action, making
her filing timely. (ECF No. 10, PageID #: 56).

up, make sure she takes her medication, cooks her food, does her
laundry, sits and talks to her, and takes care of her like a child. The
claimant does not do any chores around the house. She used to take
her uncle to dialysis but has not done that in a couple years. The
claimant indicated that she gave birth to a daughter who died in
1994, was pregnant with a son who died before birth, and had a
third child, a son, who died in 2016. She has trouble concentrating
because all she thinks about is her recently deceased son. She tried
to commit suicide after his death. She sleeps poorly despite sleep
medication, and talks to her son through the night. The claimant
said she got nervous around other people and started shaking,
because they didn't believe she would talk to her deceased son.

(ECF No. 10, PageID #: 84).

**B.  Relevant Medical Evidence[2]**

The ALJ also summarized Pifer's health records and symptoms:

Electromyogram and nerve conduction study (EMG) was
performed in June 2017, as the claimant had reported intermittent
numbness of the right arm. The study was normal, showing no
diagnostic evidence of right cervical radiculopathy, brachial
plexopathy, entrapment neuropathy, median or ulnar neuropathy
(Exhibit B-1F/1). Neurologist Gubert Tan, M.D., noted the
claimant's report that she had a seizure at age 14, was placed on
Dilantin, and stopped taking it around age 20. She had no further
spells until the year before her assessment, and those were not
clearly described and were unwitnessed. She said she experienced
tonic-clonic seizures in July 2017, December 2016, and September
2015. Her last seizure was limited to a funny sensation in her head
with muffled hearing, tunnel vision, brief unresponsiveness, and
some mild twitching. She remained in her chair without sliding off
and did not experience incontinence or tongue biting. The event
was reportedly witnessed by her boyfriend. The last event was
reportedly triggered by stress on the anniversary of the death of her
son by heroin overdose. She said she was medication compliant
with Trileptal. The claimant was alert and oriented with normal
strength and reflexes, no atrophy, and no tremor. . . . She had a
normal mood and affect, speech and behavior were normal, though
she did report feeling nervous and anxious. Dr. Tan noted that
brain MRI and EEG in 2015 were unremarkable. The differential

---

[2] Pifer's arguments center around her seizures and her mental impairments. The Court's
discussion of the medical evidence will focus on the medical evidence accordingly.

diagnosis included nonepileptic seizures, since most of her seizures recently were reportedly triggered by stress. . . . She was advised not to drive until six months after her most recent spell (Id., at 1-3).

An electroencephalogram (EEG) was performed in August 2017, based on the claimant's history of convulsions. The study was normal showing no seizure activity (Exhibit B-4F/27).

The claimant was referred to the emergency room in October 2017 for reports of left-sided weakness and left eye blurring lasting approximately one minute. She was neurologically asymptomatic in the emergency room, with motor, sensory, and cerebellar exams normal. Head CT showed no acute intracranial abnormality (Exhibit B-3F/14-19, 23). . . .

EEG was performed again in April 2018. There were no clear left to form discharge is a rectal activity, but there was some intermittent background slowing suggesting nonspecific neurophysiological disturbance (Exhibit B-7F/14). . . .

With respect to her mental impairments, the claimant was seen in follow-up in January 2017, by her medicating nurse practitioner. The claimant said she was doing well. She lived with her mother, uncle, and sister, and her uncle had recently given her his medical power of attorney, saying he trusted her with his life. She was prescribed Celexa, trazodone, buspirone, Abilify, and hydroxyzine for depression and sleep disorder, and reported good compliance though she occasionally forgot to take them. She described her mood/affect as "very good". The claimant was cooperative with logical coherent thought processes, no delusions or hallucinations, intact insight, judgment, and cognition, and denied suicidality. She said she was staying sober. She requested that her medications be continued unchanged. The claimant's welfare benefits were up for review. . . . She said her seizures were controlled on Trileptal (Exhibit B-6F/40-41). The claimant returned in February, reporting depression since being denied SSI benefits from Social Security. She was upset that she would not have money for her son's grave. She said she was crying more, isolating, and staying in her room. The claimant was cooperative, logical, and depressed. She denied delusions and hallucinations, and had intact cognition, insight, and judgment. . . . The claimant's Abilify was increased because of breakthrough depression (Id., at 37-38). In March, she said she had improved . . . . She said her home was stressful but she could go to her room. She described her mood as good, and denied delusions and hallucinations. She was casually dressed, cooperative, with normal speech and activity (Id., at 34). In April 2017, the claimant

reported increased stress. She had moved into the garage because her niece, the niece's boyfriend, and their two children had moved into the home after getting evicted. . . . She said she was depressed and almost tearful because of her son and stressors. She was cooperative but felt her energy was very low. Cognition was decreased. . . . She was helping her uncle with dialysis. The nurse discontinued Celexa and replaced it with Effexor (Id., at 31-32).

The claimant's mother brought her to the emergency room in May 2017, after she cut her wrist with a razor blade. She had made five cuts, both vertical and horizontal. The claimant said for the last few weeks she had been feeling down and depressed, and had a "nervous breakdown". The claimant's drug screen was positive for cocaine and marijuana, and her blood-alcohol was 0.242. She said her son overdosed on fentanyl on his 28th birthday, and she felt it was her fault, so she had been drinking to self medicate. She gave a history of previous psychiatric hospitalizations, most recently in 2013. . . . The claimant was admitted as she continued to voice suicidal thoughts . . . . Her diagnoses included depressive disorder, history of mixed substance abuse, antisocial personality disorder, and lacerations on the left forearm (Exhibit B-4F/55-57). . . . Two days later the claimant reported improved energy, and was getting up and socializing, rather than sleeping all day as she was doing before (Id., at 64). She indicated that her doctor had taken her of Seroquel and switched her to Effexor two weeks earlier. She indicated that she preferred Effexor (Id., at 88). The claimant denied issues with drugs or alcohol despite her positive drug screen for marijuana, cocaine, and alcohol, and admitting that she had been using and drinking heavily. She was not willing to set goals, attend groups, or participate in unit programming related to her mental health treatment. She was noted to have a history of seizures but did not describe it is a current problem (Id., at 125).

Following her hospitalization, . . . [s]he denied hallucinations and said her mood was pretty good. She was cooperative and felt her energy was slightly better since she had begun taking thyroid medication. She admitted using cocaine, alcohol, and marijuana with her sister, leading to her hospitalization (Exhibit B-6F/28). In June, three more people had moved into the home. She did not want to move in with her boyfriend because he was depressed. She said she used marijuana five dollars worth the day that her boyfriend bought. She denied hallucinations and described her mood as "good". She was cooperative and felt her energy was improved and she had better attention and concentration (Id., at 24). In July, the claimant's diagnoses were moderate major depressive disorder and generalized anxiety disorder. She denied

experiencing hallucinations. The claimant was observed to be tan and dressed in summer attire. She said her mood was okay and her attention and concentration were intact. . . . In September 2017, there were 14 people living in the household with people sleeping in the kitchen. She was spending a lot more time with her boyfriend. The claimant had changed her hair color again. Her thoughts were logical and coherent and she denied experiencing hallucinations. She planned to quit cigarettes and marijuana. Her mood was both anxious and good (Id., at 16- 17). In October 2017, she reported that she had a migraine headache and was unable to tolerate the light. She believed she had had a seizure in her sleep, but did not state why she believed that. Her mother's van had broken down and she was stressed about getting on the bus. She was staying at her boyfriend's but her uncle still needed help when he went to dialysis and doctor appointments. She had good eye contact and was spontaneous with normal thought content and no hallucinations (Id., at 12-13). In December, the claimant complained because although her niece had moved out, the claimant and her mother were still stuck with babysitting her nieces children. She was still busy helping her uncle with dialysis and felt he was grouchy all the time. . . . Her Trileptal dosage had been increased due to breakthrough seizures. Her boyfriend was supportive and she would get away to his place. The claimant denied hallucinations, and was focused on ongoing medical issues. She was logical and coherent (Id., at 8-10). In February 2018, [s]he said she was staying mostly at her boyfriend's place. . . . She stopped helping her uncle with dialysis because she was too stressed. She said she was feeling like she was hearing voices "whenever", especially when she was not around her boyfriend. She sometimes visited her mother when her boyfriend went to work. She denied experiencing hallucinations during the nursing assessment (Id., at 4-5). . . .

In April 2018, . . . [s]he said she had a seizure on April 4 and her Trileptal was increased. She was having breakthrough anxiety despite her psychotropic medications. She indicated she was thinking a lot about her deceased son but did not report any hallucinations. The claimant's Topamax was increased again and she was given a trial of Elavil, as she did not feel her sleeping pills were working (Exhibit B-8F/12-14). In May, she reported that the Elavil was more effective than trazodone, and felt the Topamax was helping. . . . The claimant was casually dressed, unkempt, overwhelmed, fidgety, and almost tearful. No hallucinations were reported, but her thoughts were "coherent to racing", focused on her son, her mother, and medical problems. Attention, concentration, and recall were intact (Id., at 8-10). Later in May

2018, the claimant had broken up with her boyfriend and was living with her mother and other family members. She was not used to a home with all the children and didn't plan to help out. She said she went to her room when she needed a break. Notice is taken that this appears inconsistent with her hearing testimony that she spent all of her time in her room and was unable to leave it because of fatigue and dislike of being around other people. She helped her uncle with his medication refills and coordinating his appointments. She is not interested in counseling, only medication management. . . . Her seizures were better. Her thought processes were logical, coherent, and racing, focused on physical problems, her ex-boyfriend, and housing. There is no report of hallucinations (Id., at 4-6).

In June 2018, the claimant talked about a friend, Gary, who was using heroin, and ironically, was the person who had gotten the claimant off heroin. . . . There was no mention of hallucinations (Exhibit B-11F/27-28). In August 2018, . . . Dr. Swarn described the claimant's thought processes as logical coherent, and racing when talking about medical problems, which she was focused on. There was no mention of hallucinations. . . . Her thoughts were again described as logical, coherent, but racing when talking about family members, with no mention of hallucinations (Id., at 19-20). Nor was there any report of hallucinations in October, although drama in the overcrowded home continued (Id., at 15-17). In November, the claimant moved out of the house and moved in with her friend, Gary, after a physical fight with one of the other residents. Mental status findings were unchanged and there was no mention of hallucinations (Id., at 11-12). The claimant moved back in with her mother in December because her friend was selling drugs. There were five adults and five children living in the house. She said she hallucinated someone getting into the bed with her. She kept her room l[ocked] to protect her stuff. The claimant's mother drove her to the appointment but the claimant said she needed bus tickets to get back home, suggesting that the claimant was able to use the public transportation system. She had no seizures during the last month. The claimant had good hygiene and energy, was wearing makeup, had logical, coherent, and occasionally racing thoughts, and expressed no delusions (Id., at 7-8). In January 2019, . . . [s]he was cooperative, with good energy, focus focused on medical/housing stressors, had fair eye [contact], and no delusions. There was no mention of hallucinations. She said her mother gives her things to do so she feels she has a role in the home. This appears inconsistent with the claimant's hearing testimony that she did not perform any tasks in the home. She said she tried not to be with all the family members because everybody

but her mother upset her (Id., at 3-5).

Treatment notes resume in August 2019, when she reported having more depression, anxiety, and stress around the anniversary of her son's death. She had started working with a therapist. She was living with him at that time and talked about difficulties with their budget. Her Keppra had been increased to 750 mg as she said her seizures and stuttering were worse. She said a friend had been helping her out with her grief issues. Her Zanaflex had been changed to an impairment town, which she did not care for. The claimant requested a bus pass because although she had been dropped off, she needed to get home independently. . . . She was noted not to be delusional, though her thoughts were racing when she talked about her boyfriend's job and her breakthrough symptoms. There was no mention of hallucinations (Exhibit B-12F/14-16). The claimant reported getting angry and throwing her psychotropic medications away, then realizing how much better she did it with them, and negotiating with the pharmacy to do an override so she could have her medications early. She had had an increase in her Abilify and felt it helped with her psychotic symptoms. Mental status findings noted that the claimant had good hygiene, and appropriate dress, wore makeup, was spontaneous and cooperative, was logical and coherent, but her thoughts raced when talking about the consequences of throwing her psychiatric pills away. There were no delusions, and no mention of hallucinations (Id., at 10-12). In October 2019, the claimant had moved back to her mother's house. Every other weekend, the claimant had to go to a friends place because her sister's children were there for visitation, and Children Services had determined that the claimant could not be around the kids. She was staying at her friend Barb's place. . . . She said her neurologist to put her on phenobarbital breakthrough seizures and said she needed to have a five day EEG. He was reportedly threatening to take away all of her seizure medications. Her friend Barry might be taking her to get the study done. Mental status findings were unchanged in the claimant was not noted to have delusions or hallucinations. Judgment and insight were limited at times, but memory was intact, and attention and concentration were fair (Id., at 6-8).

(ECF No. 10, PageID #: 85–89).

## C.        Opinion Evidence at Issue

In April 2018, Pifer's medicating psychiatrist, Francis Swarn, M.D., completed a mental status questionnaire. (ECF No. 10, PageID #: 654–55). Dr. Swarn stated that Pifer's diagnoses

included major depression, generalized anxiety, and insomnia. He noted that Pifer's mood and affect were anxious and reactive. (ECF No. 10, PageID #: 654). Dr. Swarn indicated that Pifer had severe anxiety, has poor concentration, she "gets suicidal," and frequently blames herself for the death of her son. (ECF No. 10, PageID #: 654). He opined that Pifer's ability to remember, understand, and follow directions was limited because it was affected by her anxiety and depression. (ECF No. 10, PageID #: 655). Her abilities to maintain attention, have social interaction, and adapt were poor. (ECF No. 10, PageID #: 655). Dr. Swarn also suggested that Pifer's abilities to sustain concentration and react to pressure were very poor. (ECF No. 10, PageID #: 655). The ALJ concluded that this opinion was not persuasive, reasoning:

> These statements/opinions are not persuasive as they are generalized, vague and do not specify the most the claimant is able to do despite her mental impairments. They have been considered as support for limitations in task complexity and social interaction in the mental residual functional capacity above.

(ECF No. 10, PageID #: 87).

In November 2019, Dr. Swarn completed another mental impairment questionnaire. (ECF No. 10, PageID #: 866). Dr. Swarn noted that Pifer had poor attention, mood swings, and poor concentration. (ECF No. 10, PageID #: 866). He opined that Pifer had extreme functional limitations in the following categories: 1) restrictions of activities of daily living; 2) difficulties in maintaining social functioning; 3) difficulties in maintaining concentration, persistence, or pace; and 4) episodes of decompensation[3] within a 12-month period, each of at least two weeks

---

[3] "Episodes of decompensation are exacerbations or temporary increases in symptoms or signs accompanied by a loss of adaptive functioning as manifested by difficulties in performing activities of daily living, maintaining social relationships, or maintaining concentration, persistence of pace. Episodes of decompensation may be demonstrated by an exacerbation of symptoms or signs that would ordinarily require increased treatment of a less stressful situation (or a combination of the two)." (ECF No. 10, PageID #: 868).

duration. (ECF No. 10, PageID #: 868). He indicated that Pifer had a medically documented history of a chronic organic mental, schizophrenic, or affective disorder of at least two years duration that has caused more than a minimal limitation of ability to do any basic work activity, three or more episodes of decompensation within 12 months (each at least two weeks long), a residual disease process that has resulted in marginal adjustment, and a complete inability to function independently outside the home. (ECF No. 10, PageID #: 869). Finally, he suggested that Pifer would be absent from work more than four days per month. (ECF No. 10, PageID #: 869). The ALJ found this opinion unpersuasive, explaining:

> This opinion is not persuasive as it is inconsistent with his own treatment notes describing the claimant using public transportation (Id., at 10, 14), moving back and forth between her mother's home and her boyfriend's home at will, attending medical and mental health appointments independently, and seeing her best friend regularly to vent. Notice is taken that if this were an accurate representation of the claimant's limitations, she would have no useful ability to function and would need to be institutionalized with around-the-clock care. The possibility always exists that a doctor may express an opinion in an effort to assist a patient with whom he or she sympathizes for one reason or another. Another reality which should be mentioned is that patients can be quite insistent and demanding in seeking supportive notes or reports from their physicians, who might provide such a note in order to satisfy patient's requests and avoid unnecessary doctor/patient tension. While it is difficult to confirm the presence of such motives, they are more likely in situations where the opinion in question departs substantially from the rest of the evidence of record, as in the current case. The totality of the medical evidence clearly supports that the claimant is not as severely limited as assessed by this doctor.

(ECF No. 10, PageID #: 90).

## IV.    The ALJ's Decision

The ALJ made the following findings relevant to this appeal:

> 2. The claimant has the following severe impairments: Seizure Disorder, Degenerative Joint Disease of the Left Knee; Obesity;

Carpal Tunnel Syndrome, Right, Major Depressive Disorder; Antisocial Personality Disorder; Generalized Anxiety Disorder; Insomnia; Obesity (20 CFR 416.920(c)).

3. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925 and 416.926).

4. After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 416.967(b) except that she can occasionally climb ramps or stairs, but should not climb ladders, ropes, or scaffolds. She can perform frequent balancing, stooping, kneeling crouching and crawling. She can frequently handle and finger with right hand. The claimant should avoid workplace hazards such as unprotected heights and machinery. She can perform simple, routine and repetitive tasks, involving only simple work-related decisions and with few, if any workplace changes. She can do tasks that do not involve strict production quotas or fast-pace, such as on an assembly line. She can work in positions that do not require interaction with the general public and require only occasional interaction with co-workers and supervisors with no tandem tasks.

(ECF No. 10, PageID #: 78–79, 82–83).

## V.  Law & Analysis

### A.  Standard of Review

The Court's review "is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards." *Winn v. Comm'r of Soc. Sec.*, 615 F. App'x 315, 320 (6th Cir. 2015); *see also* 42 U.S.C. § 405(g). "[S]ubstantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of HHS*, 25 F.3d 284, 286 (6th Cir. 1994)).

"After the Appeals Council reviews the ALJ's decision, the determination of the council becomes the final decision of the Secretary and is subject to review by this Court." *Olive v. Comm'r of Soc. Sec.*, No. 3:06 CV 1597, 2007 WL 5403416, at *2 (N.D. Ohio Sept. 19, 2007) (citing *Abbott v. Sullivan*, 905 F.2d 918, 922 (6th Cir. 1990); *Mullen v. Bowen*, 800 F.2d 535, 538 (6th Cir. 1986) (*en banc*)). If the Commissioner's decision is supported by substantial evidence, it must be affirmed, "even if a reviewing court would decide the matter differently." *Id.* (citing 42 U.S.C. § 405(g); *Kinsella v. Schweiker*, 708 F.2d 1058, 1059–60 (6th Cir. 1983)).

**B.        Standard for Disability**

The Social Security regulations outline a five-step process that the ALJ must use in determining whether a claimant is entitled to supplemental-security income or disability-insurance benefits: (1) whether the claimant is engaged in substantial gainful activity; (2) if not, whether the claimant has a severe impairment or combination of impairments; (3) if so, whether that impairment, or combination of impairments, meets or equals any of the listings in 20 C.F.R. § 404, Subpart P, Appendix 1; (4) if not, whether the claimant can perform her past relevant work in light of her residual functional capacity ("RFC"); and (5) if not, whether, based on the claimant's age, education, and work experience, she can perform other work found in the national economy. 20 C.F.R. § 404.1520(a)(4)(i)–(v); *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 642–43 (6th Cir. 2006). The claimant bears the ultimate burden of producing sufficient evidence to prove that she is disabled and, thus, entitled to benefits. 20 C.F.R. § 404.1512(a). Specifically, the claimant has the burden of proof in steps one through four. *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997). The burden shifts to the Commissioner at step five to establish whether the claimant has the residual functional capacity to perform available work in the national economy. *Id.*

**C.      Discussion**

Pifer raises two issues on appeal. First, she argues that ALJ incorrectly assessed her seizure disorder and mental health impairments. Within this argument, there are three sub-arguments: 1) the ALJ incorrectly found that her seizures did not meet a listing; 2) the ALJ improperly discounted the severity of her extreme hallucinations, crying spells, and depression; and 3) the ALJ improperly considered her medical source's opinion. Second, Pifer asserts that she cannot perform the jobs provided by the vocational expert. The Court will take each argument in turn.

**1.    The ALJ Properly Assessed Pifer's Impairments**

**a.      The ALJ's Conclusion that Pifer did not Meet Listing 11.02 is Supported by Substantial Evidence**

Pifer argues that the ALJ incorrectly determined that she did not meet Listing 11.02— Epilepsy. To meet a listing, the claimant "must satisfy all of the [listing's] criteria." *Nash v. Comm'r of Soc. Sec.*, No. 19-6321, 2020 WL 6882255, at *3 (6th Cir. Aug. 10, 2020). The claimant "bears the burden of showing that an impairment meets or equals a listed impairment." *Id.* As long as the ALJ's finding is supported by "substantial evidence, based on the record as a whole," the Court will defer to the ALJ's finding, "[e]ven if the record could support an opposite conclusion." *Id.* at *4.

To meet Listing 11.02, a claimant must demonstrate one of the following:

> A. Generalized tonic-clonic seizures (see 11.00H1a), occurring at least once a month for at least 3 consecutive months (see 11.00H4) despite adherence to prescribed treatment (see 11.00C).
>      OR
> B. Dyscognitive seizures (see 11.00H1b), occurring at least once a week for at least 3 consecutive months (see 11.00H4) despite adherence to prescribed treatment (see 11.00C).
>      OR
> C. Generalized tonic-clonic seizures (see 11.00H1a), occurring at

least once every 2 months for at least 4 consecutive months (see 11.00H4) despite adherence to prescribed treatment (see 11.00C); and a marked limitation in one of the following:

1. Physical functioning (see 11.00G3a); or
2. Understanding, remembering, or applying information (see 11.00G3b(i)); or
3. Interacting with others (see 11.00G3b(ii)); or
4. Concentrating, persisting, or maintaining pace (see 11.00G3b(iii)); or
5. Adapting or managing oneself (see 11.00G3b(iv)).
    OR

D. Dyscognitive seizures (see 11.00H1b), occurring at least once every 2 weeks for at least 3 consecutive months (see 11.00H4) despite adherence to prescribed treatment (see 11.00C); and a marked limitation in one of the following:

1. Physical functioning (see 11.00G3a); or
2. Understanding, remembering, or applying information (see 11.00G3b(i)); or
3. Interacting with others (see 11.00G3b(ii)); or
4. Concentrating, persisting, or maintaining pace (see 11.00G3b(iii)); or
5. Adapting or managing oneself (see 11.00G3b(iv)).

20 C.F.R. § 404 Subpart P, App. 1.

In concluding that Pifer did not meet this Listing, the ALJ stated:

Although the claimant testified to having to seizures every other day despite medications, the medical evidence is not consistent with that. The claimant told her neurologist that she experienced tonic-clonic seizures in July 2017, December 2016, and September 2015. Her last "seizure" was reportedly limited to a funny sensation in her head with muffled hearing, tunnel vision, brief unresponsiveness, and some mild twitching. Dr. Tan noted that brain MRI and EEG in 2015 were unremarkable, and her descriptions of her seizure activity were vague (See Exhibit 1F). Subsequent EEGs also showed no eleptiform activity. Although she occasionally says that she is having breakthroughs seizures in reports to her psychiatrist, the claimant has not supplied medical evidence to support her allegation of frequent breakthrough seizures despite multiple medications. The mere recitation of symptoms alone cannot serve as the basis for a finding of disability. The Regulations at 20 CFR 404.1508 and 416.908 provide that impairments "must result from anatomical, physiological, or psychological abnormalities which can be shown by medically acceptable clinical and laboratory diagnostic

techniques. A physical or mental impairment must be established by medical evidence consisting of signs, symptoms, and laboratory findings, not only by your statement of symptoms."

(ECF No. 10, PageID #: 80).

Pifer contends that the ALJ erred in his analysis because Pifer stated that she had seizures every other day, yet the ALJ discounted her allegations because she did not go to the hospital after each one. Pifer asserts that there is no requirement that she seek medical treatment for each seizure and to do so would be "impractical, time-consuming and expensive." (ECF No. 14-1 at 6). She also claims that the ALJ did "not note that there is anything that conflicts with [Pifer's] claims in the record that she has frequent seizures." (ECF No. 14-1 at 6). The Commissioner responds that the ALJ explicitly listed various inconsistencies between Pifer's allegations and the medical evidence, and his analysis was supported by substantial evidence. The Court agrees.

Despite Pifer's testimony regarding her seizures, the medical evidence did not demonstrate that she suffered from tonic-clonic seizures[4] every other day or even once every two weeks. The ALJ accurately noted multiple inconsistencies between Pifer's allegations and the medical evidence. For example, Pifer only reported to her doctor that she had tonic-clonic seizures in July 2017, December 2016, and September 2015. Although there is no requirement that Pifer receive treatment for each seizure, had she experienced them every other day it would be expected that she would have reported this to the doctor that was treating her seizures. Failure to do so demonstrates an inconsistency with her allegations. Additionally, the EEGs were

---

[4]  "[T]onic-clonic seizures are characterized by loss of consciousness accompanied by a tonic phase (sudden muscle tensing causing the person to lose postural control) followed by a clonic phase (rapid cycles of muscle contraction and relaxation, also called convulsions). Tongue biting and incontinence may occur during generalized tonic-clonic seizures, and injuries may result from falling." 20 C.F.R. § 404 Subpart P, App. 1.

inconsistent with her allegations as they showed no eleptiform activity. The ALJ was not required to accept Pifer's allegations as true where the objective evidence did not support them. *See Minor v. Comm'r of Soc. Sec.*, No. 5:18 CV 2233, 2019 WL 6525601, at *29 (N.D. Ohio Dec. 4, 2019) ("Where the objective medical evidence fails to confirm the severity of a claimant's subjective allegations, the ALJ 'has the power and discretion to weigh all of the evidence and to resolve the significant conflicts in the administrative record.'" (citations omitted)). Indeed, even Pifer did not point the Court to any objective medical evidence that supports her allegations. The Court, therefore, concludes that the ALJ's determination that Pifer did not meet Listing 11.02 was supported by substantial evidence.

### b.    The ALJ Properly Considered Pifer's Subjective Allegations

Pifer next appears to generally argue that the ALJ improperly discounted her subjective allegations. A claimant's subjective complaints "can support a claim for disability[] if there is also objective medical evidence of an underlying medical condition in the record." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 475 (6th Cir. 2003) (citations omitted). An ALJ, however, "is not required to accept a claimant's subjective complaints and may properly consider the credibility of a claimant when making a determination of disability." *Id.* at 476 (citations omitted). "[I]f an individual's statements about the intensity, persistence, and limiting effects of symptoms are inconsistent with the objective medical evidence and the other evidence, [the ALJ] will determine that the individual's symptoms are less likely to reduce his or her capacities to perform work-related activities or abilities to function independently, appropriately, and effectively in an age-appropriate manner." SSR 16-3P, 2017 WL 5180304, at *8. The ALJ's "decision must contain specific reasons for the weight given to the individual's symptoms . . . and be clearly articulated so the individual and any subsequent reviewer can assess how the

adjudicator evaluated the individual's symptoms." SSR 16-3p, 2017 WL 5180304; *see also Felisky v. Bowen*, 35 F.2d 1027, 1036 (6th Cir. 1994) ("If an ALJ rejects a claimant's testimony as incredible, he must clearly state his reason for doing so.").

Pifer asserts the ALJ did not reconcile his decision with Pifer's statements that her mother must always be with her, her mother prepares her meals, and reminds her to take her medication. Pifer notes that the ALJ witnessed her experience a crying spell and hallucinations during the hearing. Despite this, she states "the ALJ invalidates medical expertise and Pifer's physical and mental health impairments without providing any further reasoning." (ECF No. 22 at 938). Seemingly contradicting herself, she also asserts that the ALJ improperly discredited her subjective allegations because of her daily activities. The Commissioner responds that Pifer's entire argument rests on the incorrect premise that an ALJ must accept a claimant's subjective allegations. Instead, the Commissioner asserts that the ALJ considered Pifer's allegations, but the medical record did not support them.

Indeed, the ALJ considered Pifer's subjective allegations. He noted that Pifer stated that she could not work because she had five or six crying spells a day, she had pervasive hallucinations of her son, she is afraid to be around people, and that she depends on her mother for everything. (ECF No. 10, PageID #: 84, 91). Nonetheless, the ALJ gave a thorough explanation as to why he found Pifer's allegations inconsistent with her own activities and the medical evidence. The ALJ explained that Pifer had a significant group of friends with whom she was significantly intimate, she moved out of her house to live with other friends and her boyfriend, she requested bus passes from her psychiatrist multiple times to get to and from her appointments, and she had tasks that she performed in her home. (ECF No. 10, PageID #: 90–91). Pifer seems to take issue with the fact that the ALJ relied on her daily activities in making

his decision because she asserts that there is no requirement that she be utterly incapacitated to be found disabled. Although Pifer is correct that being able to perform certain daily activities does not preclude a disability determination, Pifer mischaracterizes the ALJ's reliance on such activities. The ALJ did not state that because she could leave the house and ride the bus, she could work. The ALJ actually relied on these activities to demonstrate inconsistencies between Pifer's words and her actions. It was proper for the ALJ to consider her allegations in this way. *See Bennett v. Colvin,* No. 3:11-CV-00816, 2013 WL 1635863, at *13 (M.D. Tenn. Apr. 16, 2013), (considering it proper that the ALJ relied on the fact that the claimant's allegations were contradicted by her reported daily activities in determining that the claimant's allegation were not credible), *report and recommendation adopted*, No. 3:11-CV-00816, 2013 WL 1910649 (M.D. Tenn. May 8, 2013).

Moreover, the ALJ did not solely rely on inconsistencies between Pifer's activities and her allegations. The ALJ additionally relied on the lack of medical evidence to demonstrate that Pifer's impairments were not as severe as she alleged. For example, despite stating that she had daily hallucinations, Pifer failed to report these symptoms to her psychiatrist. The ALJ reasoned that "Her failure to seek treatment for such an allegedly disturbing symptom[] despite monthly sessions with a mental health professional throughout the period under consideration appears inconsistent with her testimony regarding the degree of impairment caused by her bereavement." (ECF No. 10, PageID #: 91). This is substantial evidence to support the ALJ's conclusions. *See Viera v. Comm'r of Soc. Sec.*, No. CV 18-13476, 2019 WL 8750418, at *5 (E.D. Mich. Oct. 25, 2019) ("In evaluating Viera's headache complaints, the ALJ noted certain inconsistencies, pointing out that, although she testified that she has "headaches every day and migraines every other day," medical evidence shows that she denied headaches to her providers on several

occasions. This inconsistency was an appropriate consideration." (citations omitted)), *report and recommendation adopted*, No. 18-13476, 2020 WL 1443445 (E.D. Mich. Mar. 25, 2020).

Notably, Pifer does not point to any evidence that supports her allegations. She simply reemphasizes her subjective allegations. It is not the Court's job to reweigh the evidence. Instead, an ALJ's findings regarding a claimant's subjective allegations is accorded great deference. *See Jones*, 336 F.3d at 476. The ALJ's decision addresses Pifer's subjective complaints and explains why those complaints are not entirely consistent with the record. The ALJ's decision satisfies the Court that the ALJ considered all of the relevant evidence and that a reasonable mind might accept that evidence as adequate to support the ALJ's credibility finding. Pifer fails to identify any evidence that the ALJ did not consider. There exists, therefore, no compelling reason for the Court to disturb the ALJ's finding. *See Cross v. Comm'r of Soc. Sec.*, 373 F. Supp. 2d 724, 732 (N.D. Ohio 2005).

### c. The ALJ Properly Considered Dr. Swarn's Opinion

Pifer next asserts that the ALJ did not explain why he did not adopt her treating physician's opined limitations. At Step Four, the ALJ must determine a claimant's RFC by considering all relevant medical and other evidence. 20 C.F.R. § 404.1520(e). On January 18, 2017, the Social Security Administration amended the rules for evaluating medical opinions for claims filed after March 27, 2017.[5] *See Revisions to Rules Regarding the Evaluation of Medical Evidence*, 82 Fed. Reg. 5844 (Jan. 18, 2017). The new regulations provide that the Social Security Administration "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s)." 20

---

[5] The "treating source rule," which generally required the ALJ to defer to the opinions of treating physicians, was abrogated by 20 C.F.R. § 404.1520c for claims filed on or after March 27, 2017, such as here.

C.F.R. § 404.1520c(a). Nevertheless, an ALJ must "articulate how [he] considered the medical opinions and prior administrative medical findings" in adjudicating a claim. 20 C.F.R. § 404.1520c(a). In doing so, the ALJ is required to explain how he considered the supportability and consistency of a source's medical opinion(s), but generally is not required to discuss other factors. 20 C.F.R. § 404.1520c(b)(2). Medical source opinions are evaluated using the factors listed in 20 C.F.R. § 404.1520c(c). The factors include: supportability; consistency; the source's relationship with the claimant; the source's specialized area of practice, if any; and "other factors that tend to support or contradict a medical opinion." 20 C.F.R. §§ 404.1520c(c), 404.1520c(b)(2) ("The factors of supportability [] and consistency [] are the most important factors we consider when we determine how persuasive we find a medical source's medical opinions . . . .").

In relevant part, Dr. Swarn opined that Pifer has poor concentration, mood swings, and poor attention. He also indicated that Pifer had a medically documented history of a chronic organic mental, schizophrenic, or affective disorder of at least two years duration that has caused more than a minimal limitation of ability to do any basic work activity, three or more episodes of decompensation within 12 months (each at least two weeks long), a residual disease process that has resulted in marginal adjustment, and a complete inability to function independently outside the home. The ALJ found that Dr. Swarn's opinion was not persuasive. The ALJ explained that Dr. Swarn's opinion was not consistent with his own treatment notes or the medical record. He gave specific examples of inconsistencies and said generally:

> Notice is taken that if this were an accurate representation of the claimant's limitations, she would have no useful ability to function and would need to be institutionalized with around-the-clock care. The possibility always exists that a doctor may express an opinion in an effort to assist a patient with whom he or she sympathizes for one reason or another. Another reality which should be mentioned

is that patients can be quite insistent and demanding in seeking supportive notes or reports from their physicians, who might provide such a note in order to satisfy patient's requests and avoid unnecessary doctor/patient tension. While it is difficult to confirm the presence of such motives, they are more likely in situations where the opinion in question departs substantially from the rest of the evidence of record, as in the current case. The totality of the medical evidence clearly supports that the claimant is not as severely limited as assessed by this doctor.

(ECF No. 10, PageID #: 90). Pifer argues that the ALJ "fail[ed] to provide specific and legitimate reasons that are supported by substantial evidence for discounting" Dr. Swarn's opinion. (ECF No. 22 at 8). The Court disagrees.

As discussed above, the ALJ was required only to discuss the supportability and consistency of Dr. Swarn's opinion. The ALJ did this. Importantly, the ALJ was not required to explicitly use the word "supportability," he simply needed to explain whether the opinion was supported by objective medical evidence. 20 CFR § 404.1520c; *see also Dallas v. Comm'r of Soc. Sec*., No. 1:20-CV-1720, 2021 WL 5428827, at *12 (N.D. Ohio Oct. 26, 2021) (finding that the ALJ considered the supportability of the opinion even though he erroneously used the word "consistency"), *report and recommendation adopted,* No. 1:20-CV-01720, 2021 WL 5416718 (N.D. Ohio Nov. 19, 2021). Regarding the supportability of the opinion, the ALJ explained that Dr. Swarn's opinion was not consistent with—meaning it could not be supported by—his own treatment notes. As the ALJ noted, despite opining that Pifer could not function independently outside her home, his notes indicated that she had attended appointments alone, asked for bus passes to return home on her own, moved out of her home to live with her boyfriend, and spent time with friends. These activities are inconsistent with such an extreme opinion and provide substantial evidence for the conclusion that Dr. Swarn's opinion was not supported by his own

records.[6] The ALJ also stated that this opinion was inconsistent with these treatment notes and the medical record as a whole. He noted that if Dr. Swarn's opinion were true, Pifer would need around the clock care, which was not consistent with the medical record. Thus, contrary to Pifer's arguments, the ALJ did explain why he did not consider Dr. Swarn's opinion persuasive. The Court finds that the ALJ supported his conclusion with substantial evidence. Therefore, Pifer's argument is without merit.

### 2.  The ALJ's Hypothetical Question to the Vocational Expert was Proper

Finally, Pifer argues that she cannot perform the jobs provided by the VE. She states that the ALJ did not provide the ALJ with a hypothetical that accurately portrayed her limitations. The Commissioner correctly points out that this argument is a reformulation of her argument attacking the adequacy of the ALJ's RFC determination. "The testimony of a vocational expert may be substantial evidence to support a decision of the ALJ if that testimony is made in response to a hypothetical question that accurately portrays the mental and physical impairments of the claimant." *Thompson v. Comm'r of Soc. Sec.*, No. 3:11-CV-493-H, 2012 WL 2089709, at *12 (W.D. Ky. May 7, 2012) (citing *Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512–513 (6th Cir. 2010)), *report and recommendation adopted*, No. 3:11-CV-493-H, 2012 WL 2089708 (W.D. Ky. June 8, 2012). The ALJ may pose a hypothetical to the VE "on the basis of the ALJ's assessment of the claimant's credibility." *Id.* (citing *Jones v. Comm'r,* 336 F.3d 469, 475–76 (6th Cir. 2003)). The hypothetical does not need to include a list of the claimant's medical conditions

---

[6]  Pifer conflates her arguments. In discussing the ALJ's treatment of Dr. Swarn's opinion, Pifer states that the ALJ improperly relied on her daily activities to discount her subjective allegations. Regarding Dr. Swarn's medical opinion, the ALJ simply stated that Dr. Swarn's medical opinion was not supported by his reports of her daily activities. The ALJ did not err in doing so as he was required to discuss whether the opinion was supported. In this explanation, he did not discuss his treatment of her subjective allegations. The ALJ's treatment of Pifer's subjective allegations was discussed above where the Court similarly found no error.

or incorporate limitations asserted by the claimant that are properly rejected by the ALJ. *See id.* Here, the ALJ posed a hypothetical consistent with the RFC. (ECF No. 10, PageID #: 177). As discussed above, the ALJ properly considered all of the relevant medical evidence and Pifer's subjective allegations in making his RFC determination. The ALJ's decision to discredit Pifer's subjective allegations was supported by substantial evidence. The Court found no reason to disturb the ALJ's RFC conclusion. Accordingly, the ALJ did not error and Pifer's arguments are without merit.[7]

## VI.    Conclusion

Based on the foregoing, the Court AFFIRMS the Commissioner's final decision denying Pifer SSI.

**IT IS SO ORDERED.**

Dated: May 13, 2022

s/ *Carmen E. Henderson*
CARMEN E. HENDERSON
U.S. MAGISTRATE JUDGE

---

[7] In her reply brief, Pifer argues for the first time that the ALJ did not give proper weight to her fibromyalgia diagnosis. However, "it is well-established that new substantive issues cannot be raised in a reply brief." *Colvin v. Comm'r of Soc. Sec.*, No. 4:18CV1249-JRA, 2019 WL 4743624, at *4 (N.D. Ohio Sept. 30, 2019) (citations omitted). Thus, this argument was waived. *See id.*